J-S49016-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: J.M.L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.F., MOTHER | : | No. 539 EDA 2019 |

Appeal from the Decree January 14, 2019
In the Court of Common Pleas of Philadelphia County
Family Court at No: CP-51-AP-0000606-2018,
CP-51-DP-0002351-2016

BEFORE: BENDER, P.J.E., STABILE, J., and STEVENS, P.J.E.*

MEMORANDUM BY STABILE, J.: **FILED NOVEMBER 19, 2019**

J.F. ("Mother") appeals from the decree dated January 14, 2019,[1] in the

Court of Common Pleas of Philadelphia County, which terminated involuntarily

_____

* Former Justice specially assigned to the Superior Court.

[1] The docket indicates that notice of the decree was not sent until April 12, 2019, and that notice was sent to only the Philadelphia Department of Human Services ("DHS"), the Philadelphia Solicitor's Office, and the child advocate attorney. The docket does not indicate that notice of the decree was sent to Mother. **See In re L.M.**, 923 A.2d 505, 508-09 (Pa. Super. 2007) (explaining in an involuntary termination of parental rights appeal that the Rules of Appellate Procedure designate "the date of entry of an order as the day on which the clerk makes the notation in the docket that notice of entry of the order has been given[.]") (citation and quotation marks omitted) (emphasis omitted).

her parental rights to her daughter, J.M.L.M. ("Child"), born in October 2016.[2]

Mother also appeals from the order dated March 6, 2019,[3] which changed

Child's permanent placement goal from reunification to adoption. After careful

review, we are constrained to reverse the termination decree. However, we

affirm the goal change order, because Mother failed to preserve a challenge

to that order for our review.[4]

---

[2] The trial court entered a decree confirming the consent of Child's father, L.M. ("Father"), and terminating his parental rights on March 6, 2019. Father did not appeal the termination of his rights.

[3] The docket indicates that notice of the order was sent to counsel for Father, the child advocate attorney, DHS, and the Philadelphia Solicitor's Office. The docket does not indicate that notice was ever sent to Mother.

[4] In her notices of appeal, filed February 13, 2019, Mother indicated that she was appealing both the decree terminating her parental rights involuntarily and the order changing Child's permanent placement goal to adoption. She averred that the trial court issued the decree and the order on January 14, 2019. However, the record reveals that the court did not enter a goal change order on that day. While the court entered a permanency review order, the order did not change Child's goal. The court did not issue a goal change order until March 6, 2019, the same day that it terminated Father's parental rights.

It appears that Mother's premature appeal does not prevent this Court from addressing the goal change order, since the trial court stated on January 14, 2019, that it was changing Child's goal. N.T., 1/14/19, at 63 ("The goal for the child is changed to adoption"); **see also** Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof."). Nonetheless, Mother waived any challenge to the goal change by failing to develop an argument in her brief supported by citation to relevant legal authority. **In re M.Z.T.M.W.**, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to

We summarize the facts and procedural history of this matter as follows. DHS filed an application for emergency protective custody of Child on August 30, 2017, averring that it had received a general protective services report raising substances abuse concerns regarding Father earlier that month. DHS implemented a safety plan whereby Mother and Child's grandmother would serve as Child's caretakers.[5] However, DHS averred that the safety plan failed after it received an additional general protective services report indicating that Child had been admitted to the hospital due to vomiting and diarrhea. The report indicated that both Mother and the grandmother appeared to be under the influence at the hospital, and that Mother had been behaving erratically. The juvenile court granted emergency protective custody that same day. The court entered a shelter care order on September 1, 2017, and adjudicated Child dependent on September 13, 2017.

Just over ten months later, on July 25, 2018, DHS filed petitions to terminate Mother's parental rights to Child involuntarily and to change Child's permanent placement goal from reunification to adoption. The trial court held

_____

relevant authority."). We therefore affirm the March 6, 2018 order changing Child's permanent placement goal to adoption.

[5] The application for emergency protective custody refers to the grandmother as Child's "MGM," or maternal grandmother, while the remainder of the pleadings describe her as Child's paternal grandmother. Also, we note that DHS's dependency petition indicates that Father, and not Mother, was one of Child's designated caretakers pursuant to the safety plan, despite the fact that it was Father's substance abuse that brought the case to DHS's attention. *See* Dependency Petition, 9/8/17, at ¶ c ("A Safety Plan was created, with [the grandmother] and [Father] as the safety providers, which stated that [Father] was to have no unsupervised contact with [Child].").

- 3 -

a hearing on January 14, 2019, at which DHS presented testimony detailing Mother's progress toward regaining custody of Child. First, DHS presented the testimony of the Community Umbrella Agency ("CUA") case manager supervisor, Kaitlin Sullivan. Ms. Sullivan testified that CUA prepared a series of Single Case Plan ("SCP") objectives for Mother, including obtaining safe and stable housing, obtaining employment, visiting Child, attending substance abuse treatment, and attending mental health treatment. N.T., 1/14/19, at 6.

Concerning Mother's compliance with her SCP objectives, Ms. Sullivan testified that Mother had obtained employment, as well as safe and stable housing. *Id.* at 13, 17-18. She further testified that Mother was attending visits with Child consistently, although her attendance had been inconsistent in the past. Specifically, she reported that Mother attended eight out of twelve possible visits between December 13, 2017, and March 15, 2018; one out of four possible visits between March 15, 2018, and July 20, 2018; and four out of four possible visits between July 20, 2018, and October 26, 2018. *Id.* at 14. She noted that Mother's visits are "positive. And Mother's parenting is appropriate." *Id.* at 15.

Nonetheless, Ms. Sullivan testified that she did not support reunification, "[b]ecause Mother has not, over the life of this case, addressed the mental health and drug and alcohol issues that brought this case in." *Id.* at 18. Ms. Sullivan explained that Mother tested positive for marijuana on September 1, 2017, November 27, 2017, December 1, 2017, January 17, 2018, February

14, 2018, March 15, 2018, April 30, 2018, and July 19, 2018. *Id.* at 7-8. She tested negative on December 8, 2017, October 11, 2018, and possibly on other dates "that are beyond when the petition was filed." *Id.* In addition, Ms. Sullivan reported that Mother completed a dual diagnosis assessment in December 2017, which recommended treatment. *Id.* at 7, 10. Mother began attending an intensive outpatient dual diagnosis program in January 2018. *Id.* at 10. She completed a psychological evaluation that same month, and received diagnoses including "cannabis-use disorder, severe; schizoaffective [disorder], bipolar type; OCD; PTSD; [and] cluster-B personality traits." *Id.* at 11. Mother attended treatment for only "about a month-and-a-half," but then moved to Baltimore, Maryland, in approximately February 2018. *Id.* at 10, 20. Due to her move, Mother was unable to continue receiving treatment from her prior provider.[6] *Id.* at 11-12.

Ms. Sullivan testified that Mother resumed attending substance abuse treatment in Maryland. *Id.* at 11, 20. She explained that Mother's health insurance did not "c[o]me back on" until approximately May 2018. *Id.* at 20.

---

[6] Mother's move to Maryland had a number of other effects as well. Mother's move caused her to stop receiving housing and employment services at the Achieving Reunification Center ("ARC"), where she had completed an intake appointment in approximately January 2018. N.T., 1/14/19, at 16-17. As stated above, Mother went on to obtain housing and employment in Maryland. *Id.* at 13, 17-18. Mother's move also caused a reduction in her visits with Child from weekly to monthly. *Id.* at 18. Finally, Mother's SCP objectives had initially included completing a parenting program, but CUA eliminated that objective after the move because "it was really not a concern." N.T., 1/14/19, at 6, 13.

In the meantime, CUA had recommended that Mother obtain a "level of care assessment" in Pennsylvania so that she could obtain treatment in Maryland. *Id.* Mother did not follow through with that recommendation. *Id.* Instead, she opted to obtain an assessment from the Bureau of Behavioral Health in Maryland in July 2018. *Id.* The assessment indicated a diagnostic impression of "[c]annabis use disorder - severe" and recommended that Mother receive "[s]tandard [o]utpatient [c]ounseling." Exhibit DHS 2 (Summary of Findings and drug screen results). Mother appeared for an appointment at the Mount Manor treatment facility in August 2018. N.T., 1/14/19, at 9, 20. However, as Ms. Sullivan acknowledged, "the result of that appointment was that no treatment was required." *Id.* at 20. Ms. Sullivan added that Mother resumed mental health treatment in July 2018 and last attended treatment in October 2018. *Id.* at 12.

In addition, DHS presented the testimony of the CUA case manager currently assigned to this matter, Chauntevia Flowers. Ms. Flowers confirmed that Mother has maintained employment as well as safe and stable housing. *Id.* at 26. She explained, "Mom is working two jobs from my understanding. We do have pay stubs. . . . Mom provided me a letter from one of her jobs stating that she is the current general manager there, and she did take the drug test to have that position." *Id.* at 30. Nonetheless, Ms. Flowers indicated that she too did not support reunification with Mother, "[b]ased on the case history, and from my understanding, there were drug and alcohol and mental health objectives that Mom needs to address as well." *Id.* at 26.

Regarding Mother's substance abuse SCP objective, Ms. Flowers testified that Mother went to a substance abuse treatment facility called Hope's Horizon in October 2018. *Id.* at 22-23. Ms. Flowers explained that she received documentation indicating that Mother "attended Hope's Horizon on October 11th of 2018 and it was recommended that she didn't need further drug and alcohol treatment but to remain engaged in mental health therapy." *Id.* at 22. Despite the documentation indicating that Mother was not in need of further substance abuse treatment, Ms. Flowers was hesitant to say whether Mother had completed her substance abuse SCP objective. She explained, "I have documentation stating that Mom needed no further recommendation. [*sic*] I'm not really sure if that qualifies as completing her objective." *Id.* at 27.

Regarding Mother's mental health SCP objective, Ms. Flowers testified that Mother last attended mental health treatment on October 30, 2018. *Id.* at 23. She then failed to attend mental health treatment appointments on December 4, 2018, and December 11, 2018. *Id.* at 23-24. Despite missing the appointments, Ms. Flowers testified that Mother remained enrolled with her mental health treatment provider and had an appointment scheduled "for tomorrow[,]" which would have been January 15, 2019. *Id.* at 31.

At the conclusion of the hearing, the trial court announced its intention to terminate Mother's parental rights to Child involuntarily and change Child's permanent placement goal from reunification to adoption. The court issued a decree memorializing its involuntary termination decision dated January 14,

2019, and issued a goal change order on March 6, 2019. As noted above, Mother filed a notice of appeal on February 13, 2019.[7] She included a concise statement of errors complained of on appeal.

Mother now presents the following question for our review: "Whether there was a legal basis for terminating [Mother's] parental rights pursuant to 23 Pa.C.S.A. [§] 2511(a)(1), (2), (5), (8)[,] and (b) to change [*sic*] goal from reunification to adoption[?]" Mother's Brief at 6 (unnecessary capitalization omitted).

We apply the following standard of review when considering an appeal from a decree terminating parental rights involuntarily:

---

[7] It appears from the record that Mother's counsel produced a single notice of appeal, including the docket numbers from both the involuntary termination and goal change matters, which was then photocopied and filed separately at both dockets. This Court issued a rule to show cause order on June 19, 2019, based on counsel's failure to comply with Rule 341 of our Rules of Appellate Procedure. **See** Pa.R.A.P. 341, Note ("Where . . . one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."); **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018) (holding that the failure to file separate notices of appeal from an order resolving issues on more than one docket "requires the appellate court to quash the appeal"). Counsel did not respond to this Court's order.

In a recent case, a panel of this Court declined to quash an involuntary termination appeal based on noncompliance with Rule 341, recognizing the possibility that "decisional law may have been unclear to this point[.]" **In the Matter of: M.P.**, 204 A.3d 976, 981 (Pa. Super. 2019). However, the panel announced that this Court would quash any noncompliant appeals filed after the date of its decision on February 22, 2019. **Id.** at 986. Because Mother filed her notice of appeal over a week in advance of our decision in **M.P.**, we likewise decline to quash the instant appeals.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

. . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the trial court terminated Mother's parental rights to Child involuntarily pursuant to Section 2511(a)(1), (2), (5), (8), and (b), which provides as follows:

- 9 -

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\*\*\*

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), (b).

On appeal, Mother contends that the trial court erred by terminating her parental rights because it concluded erroneously that she failed to comply with her SCP goals. Mother's Brief at 9-10. Mother maintains that she remedied her substance abuse issues. *Id.* at 10. Specifically, she directs our attention to the testimony of Ms. Sullivan and Ms. Flowers, who stated that two separate programs concluded Mother was not in need of substance abuse treatment. *Id.* at 10-11. Mother appears to credit her move to Maryland for at least a portion of this success, asserting that her substance abuse was "no longer an issue" after the move. *Id.* She also asserts that she complied with mental health treatment, obtained suitable housing, visited with Child regularly, and

maintained employment. *Id.* She asserts that she was succeeding at her job and that she was in training to become a general manager.[8] *Id.* at 11.

The trial court explained its decision to terminate Mother's rights to Child as follows, in relevant part:

> The underlying Petition to Terminate Mother's Parental Rights was filed on July 25, 2018, after Mother failed to meet her SCP objectives. Specifically, Mother failed to receive substance abuse and mental health treatment. The record also showed that Mother tested positive on numerous drug tests. Although there were indications that Mother had obtained suitable employment and housing, she was not able to demonstrate that she completed substance abuse and mental health treatment. . . .
>
> ***
>
> Child was adjudicated dependent on October 20, 2017. [*sic*] The record demonstrated Mother's ongoing inability to provide care for or control of Child due to her failure to remedy the conditions that brought the [c]hild into care. Specifically, Mother failed to receive substance abuse treatment and mental health treatment. The record also demonstrated that Mother tested positive on numerous drug tests.
>
> ***
>
> . . . . Although there were indications that Mother had obtained suitable employment and housing, she was unable to provide sufficient evidence as to her financial stability and was unable to show that she had completed substance abuse and mental health treatment. Furthermore, the record indicates that Mother had not resumed mental health treatment until after the filing of the Petition for Termination of Parental Rights.
>
> The testimony of Ms. Sullivan and Ms. Flowers and the documents and testimony presented at the Termination Hearing provided the trial court clear and convincing evidence to terminate

---

[8] As quoted above, the testimony at the hearing was that Mother was already a general manager. N.T., 1/14/19, at 30.

Mother's parental rights. The trial court also found that the termination of these rights would be in the best interest of Child pursuant to 23 Pa. C.S.A. [*sic*] §§[]2511(a)(1)[,] (2)[,] (5)[,] and (8) and 23 Pa.C.S.A. § 2511(b). Although Mother had made progress since the [c]hild was adjudicated dependent, Mother was unable to convince the trial court that she was in control her [*sic*] drug addiction. Additionally, Mother was unable to convince the trial court that she was receiving adequate mental health treatment . . . .

Trial Court Opinion, 4/21/19, at 3-7 (footnotes omitted).

After careful review of the certified record in this case, and mindful of our standard of review, which requires us to show great deference to the trial court, we are constrained to reverse the decree terminating Mother's parental rights involuntarily. We do so for two reasons. First, the evidence supporting the court's decision is highly tenuous and directly contradicts certain of the court's findings. Second, the court's opinion reveals that it committed an error of law by shifting the burden of proof onto Mother. We discuss these problems in turn.

We begin with a discussion of the evidence supporting the trial court's termination decree with respect to each of the relevant subsections of Section 2511(a). For ease of disposition, we will address Section 2511(a)(1) first. To satisfy the requirements of this subsection, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008). The trial court

must then consider the parent's explanation for his or her abandonment of the child, in addition to any post-abandonment contact. *Id.* This Court has emphasized that a parent does not perform parental duties by displaying a merely passive interest in the development of a child. *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather,

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* (citations omitted).

Here, DHS filed its petition to terminate Mother's parental rights to Child involuntarily on July 25, 2018, such that the relevant six-month period began on January 25, 2018. At the start of the relevant period, as detailed above, Mother was addressing CUA's substance abuse and mental health concerns by attending an intensive outpatient dual diagnosis treatment program, although the record suggests that she may not have been attending the program with complete consistency. It also appears that Mother was attending the majority of her visits with Child, as she attended eight out of the twelve possible visits between December 13, 2017, and March 15, 2018. At or near the start of the

period, Mother attended an intake appointment at ARC for employment and housing services.

It is true that Mother's progress decreased significantly by March 2018. Mother attended only one out of four possible visits between March 15, 2018, and July 20, 2018. In addition, she left her dual diagnosis treatment program and her services at ARC in approximately February 2018. However, Mother resumed her progress by obtaining an assessment at the Bureau of Behavioral Health in Maryland on July 19, 2018. After obtaining the assessment, Mother sought out further substance abuse treatment at two facilities and reenrolled in mental health treatment.[9] She also obtained housing and employment,

_____

[9] In its opinion, the trial court indicates that "Mother had not resumed mental health treatment until after the filing of the Petition for Termination of Parental Rights." Trial Court Opinion, 4/21/19, at 6. This statement appears to be a reference to Section 2511(b). The statute states, in relevant part, that "[w]ith respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

After review, there is no indication in the record exactly when Mother resumed attending mental health treatment. The record indicates that Mother enrolled in treatment "in July of 2018," apparently "following the 7/20 court date[,]" and that she last attended in October 2018. N.T., 1/14/19, at 12. It is possible, therefore, that Mother resumed mental health treatment prior to the filing of the termination petition on July 25, 2018.

In addition, the question that Section 2511(b) presents is not whether Mother enrolled in mental health treatment before DHS filed the petition to terminate her rights. The question is whether Mother "first initiated" her "efforts . . . to remedy the conditions described" in Section 2511(a)(1) before she received notice that DHS filed the petition to terminate her rights. *Id.* In the instant matter, it appears from the record that Mother initiated her efforts

although it is not clear from the record precisely when that occurred. Mother may have obtained her housing and employment well before the six months concluded.[10] This evidence indicates, at best, that Mother was performing her parental duties at the start of the relevant six-month period, refused or failed to perform parental duties for approximately several months, and then began performing parental duties again before the six-month period ended. Thus, the record does not support the termination of Mother's rights pursuant to Section 2511(a)(1).

The record also belies the trial court's findings and conclusions regarding Section 2511(a)(5) and (8). Both of these subsections require, among other things, that a parent fail to remedy "the conditions which led to the removal or placement of the child[.]" 23 Pa.C.S.A. § 2511(a)(5), (8). This Court has defined what constitutes the relevant "conditions" somewhat broadly. By way

_____

by obtaining an assessment on July 19, 2018, six days before the filing of the petition. Therefore, to the extent the court failed to consider Mother's efforts based on its belief that she did not reenroll in mental health treatment until after DHS filed its petition, it misapplied Section 2511(b).

[10] We note that the trial court states in its opinion that Mother "was unable to provide sufficient evidence as to her financial stability[.]" Trial Court Opinion, 4/21/19, at 6. However, it was undisputed during the hearing that Mother had obtained safe and stable housing, as well as employment. Ms. Flowers testified that Mother was working two jobs and that she provided CUA with paystubs, as well as a letter indicating that she was employed as a general manager at one of those jobs. N.T., 1/14/19, at 30. There was simply no question during the hearing that Mother was financially stable and there was no basis for the court to conclude otherwise. *See In the Interest of H.K.*, 172 A.3d 71, 80 (Pa. Super. 2017) ("[T]rial courts may not engage in the capricious disregard of competent and credible evidence").

- 16 -

of example, we have held that a parent failed to remedy the conditions causing her child's placement when the placement resulted primarily from the parent's positive drug test for cocaine and the parent was later incarcerated for drug offenses. *See In re C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008) ("Mother's conviction and subsequent term of incarceration derives directly from her 'drug issues,' it is a part of the original reasons for the removal of C.L.G. from Mother's care and forms a basis for the termination of Mother's parental rights pursuant to Section 2511(a)(8).").

In this case, the record is clear that Mother's alleged substance abuse was the primary if not the sole cause of Child's placement. Mother's recent substance abuse issues appear to have consisted entirely of marijuana use[11] and Mother received a diagnosis of cannabis dependence after she completed her psychiatric evaluation on January 18, 2018.[12] Exhibit DHS 3 (Psychiatric Evaluation) at 3. As noted above, Mother also completed an assessment in Maryland on July 19, 2018, receiving a diagnosis of "[c]annabis use disorder – severe." Exhibit DHS 2 (Summary of Findings and drug screen results). She tested positive for THC on the same day. *Id.*

However, the record appears to indicate that Mother's substance abuse issues were largely resolved by the time of the hearing. While Mother's July

---

[11] Mother reported that she used opioids "several years ago[.]" Exhibit DHS 3 (Psychiatric Evaluation) at 3-4.

[12] Page three of the evaluation describes the diagnosis as "[c]annabis use d/o, severe," while page four describes the diagnosis as "[c]annabis dependence, uncomplicated[.]" Exhibit DHS 3 (Psychiatric Evaluation) at 3-4.

2018 assessment indicated a diagnosis of "severe" cannabis use disorder, the assessment recommended that she receive standard outpatient counseling only. Exhibit DHS 2 (Summary of Findings and drug screen results). Further, Ms. Sullivan and Ms. Flowers testified that two substance abuse treatment facilities, Mount Manor in August 2018 and Hope's Horizon in October 2018, concluded that Mother was not in need of substance abuse treatment. Indeed, Ms. Sullivan testified that Mount Manor even declined to admit Mother despite her request for treatment. **See** N.T., 1/14/19, at 9-10 ("Mother went for an intake at Mount Manor . . . in August. And Mother was provided a letter that she was declined for services.").[13] Given this evidence, the record contradicts rather than supports the trial court's finding that Mother failed to remedy the conditions causing Child's placement pursuant to Section 2511(a)(5) and (8).

Finally, we turn our attention to Section 2511(a)(2). Our Courts adhere to the following analysis:

> . . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

---

[13] DHS contends inaccurately that Mother refused to attend services at Mount Manor. **See** DHS's Brief at 10 ("Mother attended intake at Mount Manor in August 2018 but later declined services.").

- 18 -

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

As we have established, Mother had safe and stable housing, as well as employment, at the time of the termination hearing. Moreover, two separate facilities indicated that Mother was not in need of further substance abuse treatment. The only remaining problem indicating that Mother may not be able to provide parental care for Child, therefore, was that she suffered from mental health issues. The record suggests that Mother's mental health issues were, at the time of her psychiatric evaluation in January 2018, severe. DHS entered a copy of Mother's evaluation into evidence, which indicated that she received diagnoses including schizoaffective disorder, bipolar type; cannabis dependence; post-traumatic stress disorder; and obsessive compulsive disorder. *See* Exhibit DHS 3 (Psychiatric Evaluation), at 4. The evaluation also indicated that Mother displays "Cluster B personality traits[.]" *Id.* at 3. Among other things, Mother reported at the evaluation that she had recent urges to harm herself or commit suicide, and that she had "attacked people . . . 'a couple of days ago.'" *Id.* at 1. Mother even reported that she had been "'stealing a lot'" and "seeing shadows and . . . 'people who're not there.'" *Id.* If these types of symptoms persisted until the time of the hearing on

January 14, 2019, it is clear that Mother would not be capable of providing parental care to Child.

Another critical factor in any Section 2511(a)(2) analysis is the subject child's need for permanence and stability. As this Court has often emphasized, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Here, Child had remained in foster care for a year and four months by the time of the hearing. Mother failed for a significant portion of that time to address DHS's concerns and then moved to Maryland, which has limited to her ability to maintain a relationship with Child.

There is, however, a significant problem with the trial court's decision to terminate parental rights with respect to Section 2511(a)(2), which is that Mother's mental health issues were evidently far less severe at the time of the hearing. By all accounts, Mother had been leading a high-functioning lifestyle since her move to Maryland, in that she maintained safe and stable housing, worked two jobs, and had risen to the level of general manager at one of her jobs. Once again, Mother underwent an assessment on July 19, 2018, which

recommended that she attend standard outpatient counseling only.[14] Mother enrolled in mental health treatment and remained enrolled at the time of the hearing, although she did not attend two recent appointments. Mother was also attending visits with Child in the months prior to the hearing consistently and it was undisputed that Mother's parenting was "appropriate" and "really not a concern." *Id.* at 13-15. Realistically, it is doubtful that any parent with a history of significant mental health issues will ever "complete" treatment, or that he or she will be "cured" such that treatment will no longer be necessary. Given that Mother's history of mental health issues did not appear to be interfering with her life, and given that she remained enrolled in mental health treatment, it was far from certain that this history would prevent her from parenting Child, or that she could not or would not remedy her parental incapacity pursuant to Section 2511(a)(2).

Nonetheless, even if we were to conclude that DHS did present sufficient evidence to support the involuntary termination of Mother's parental rights to Child, we would still reverse the trial court's decree, as our review of the court's opinion reveals that it committed, perhaps unintentionally, an error of law with regard to the burden of proof in this case. As quoted above, the court stated that it terminated Mother's parental rights, in part, because she "was not able to demonstrate that she completed substance abuse and mental

---

[14] While the assessment does not appear to have been as thorough as Mother's January 2018 psychiatric evaluation, it may be worth noting that it did not indicate any of the same diagnoses as the evaluation, other than cannabis use disorder.

health treatment," and because she "was unable to provide sufficient evidence as to her financial stability." Trial Court Opinion, 4/21/19, at 3, 6. The court added that Mother "was unable to show that she had completed substance abuse and mental health treatment," and that she "was unable to convince the trial court" that she was in control of her drug addiction and receiving adequate mental health treatment. *Id.* at 6-7. These statements suggest that the court placed the burden of proof at the termination hearing on Mother, rather than DHS. Instead of requiring that DHS prove Mother was an unsuitable parent, it appears that the court required Mother to prove that she remedied DHS's allegations and concerns.

It is beyond cavil that the burden of proof in an involuntary termination proceeding rests solely on the petitioning party, and that the petitioning party must meet that burden by clear and convincing evidence. *See Santosky v. Kramer*, 455 U.S. 745 (1982) ("Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence."); *In re D.C.D.*, 105 A.3d 662, 676 (Pa. 2014) ("Ultimately, the grounds of termination must be demonstrated by the state by clear and convincing evidence."). Stated plainly, Mother did not need to convince the trial court of anything. *See Bartasavich v. Mitchell*, 471 A.2d 833, 836 (Pa. Super. 1984) ("We note most emphatically that it is not appellant's burden to show his capability, but rather, it is the burden of the petitioner who seeks the termination of his parental rights to show his incapacity."). It was DHS's

- 22 -

obligation to produce clear and convincing evidence in support of its petition and the court's statements to the contrary are indicative of impermissible burden shifting in violation of Mother's right to due process.[15]

_____

[15] Burden shifting appears to have been a theme even during the hearing. For example, as the following illustrates, we observe that the child advocate cross-examined Mother regarding her failure to produce expert witnesses, as follows:

> [Child advocate]: It's going to be a hearing for termination of your parental rights. Do you have an expert today from your drug and alcohol program that indicates you don't need any treatment?
>
> THE MOTHER: I have two letters from two different drug and alcohol programs.
>
> [Child advocate]: Objection, Your Honor. Non-responsive once again.
>
> THE COURT: Sustained.
>
> [Child advocate]: Do you have an expert today from your mental health treatment program that indicates you're compliant with drug and -- with mental health?
>
> THE MOTHER: What do you mean by that?
>
> [Child advocate]: Do you have your therapist here today so that they can advocate on your behalf that you're compliant with your mental health?
>
> THE MOTHER: Honestly, is that a realistic question? If I got --
>
> [Child advocate]: Your Honor, I'm going to --
>
> THE COURT: Sustained.

In the interest of avoiding confusion, we stress that a parent's failure to cooperate with services will often be a relevant factor that the trial court may consider during a termination proceeding. If a parent suffers from a drug and alcohol addiction, and DHS presents testimony indicating that the parent has taken no known action to address that addiction, the court is free to infer that the addiction remains unresolved. However, there is a substantial difference between making inferences based on circumstantial evidence and placing the burden on a parent to prove that he or she has rectified DHS's concerns. The court's statements in this case indicate that it engaged in the latter course of conduct, which further justifies our decision to reverse the court's termination decree.[16]

Before concluding our review, we stress that we appreciate the difficulty that these cases pose and that our trial courts must often resolve many such cases in a very short period of time. We also appreciate that the children at issue in these cases are deserving of permanence and stability, and that courts must work to achieve these goals as quickly as possible in the children's best interests. However, courts must also work to protect parents' constitutionally protected rights to the care and custody of their children, and may not sacrifice

---

N.T., 1/14/19, at 38-39.

[16] Because we hold that the record does not support the trial court's decision to terminate Mother's parental rights pursuant to Section 2511(a), we need not consider whether the record supports the court's decision to terminate pursuant to Section 2511(b).

those rights in the interest of achieving expedient results. In the case at bar, DHS sought to terminate Mother's parental rights only ten months after Child's adjudication of dependency and only eleven months after Child entered foster care.[17] The court then granted DHS's request in part by relying on Mother's failure to produce sufficient evidence in her own defense. Given Mother's significant progress at the time of the hearing, and given that the burden of proof rested solely on DHS, it appears DHS's termination petition and the court's decision to grant termination was precipitous.

Based on the foregoing analysis, we conclude that the trial court abused its discretion and committed an error of law by terminating Mother's parental rights to Child involuntarily. Thus, we reverse the court's January 14, 2019 decree. Because Mother waived any challenge regarding the March 6, 2019 goal change, we affirm that order. We hasten to add that reversing the decree does not mean that Child must return to Mother's care. Child should remain

_____

[17] The Juvenile Act contemplates that a child protective services agency will have filed a petition to terminate parental rights once the subject child has remained in placement for at least fifteen of the last twenty-two months. *See* 42 Pa.C.S.A. § 6351(f)(9) ("At each permanency hearing, a court shall determine . . . [i]f the child has been in placement for at least 15 of the last 22 months . . . whether the county agency has filed or sought to join a petition to terminate parental rights[.]"). We acknowledge that this is not a minimum time that must elapse before an agency may file a termination petition. *See* *In the Interest of L.T.*, 158 A.3d 1266, 1279 (Pa. Super. 2017) ("It is beyond cavil that the fifteen-to-twenty-month [*sic*] period outlined in § 6351 is not a prerequisite to a goal change, but rather, an aspirational target in which to attain permanency."). We mention it merely to illustrate our concern with the speed with which DHS moved to terminate Mother's parental rights while she was making substantial progress towards reunification.

in her current foster care placement for the time being. DHS may file a new petition to terminate Mother's parental rights, but we emphasize that the court may not grant that petition unless DHS presents clear and convincing evidence and develops a record establishing grounds to support termination pursuant to Section 2511.

Decree reversed. Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/19/19